# COURT OF APPEALS

OF

## North Carolina

AT

## Raleigh

---

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; DUKE ENERGY
CORPORATION; PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMIS-
SION; and WELLS EDDLEMAN, Pro Se, Petitioners v. CAROLINA UTILITY
CUSTOMERS ASSOCIATION, INC. (Intervenor) Respondent v. DUKE ENERGY
CORPORATION, Cross-Appellant

No. COA03-440

(Filed 17 February 2004)

**Utilities— settlement agreement—standing of interveners**

The interveners in a settlement agreement between Dukĕ
Power and the Utilities Commission in an investigation of Duke
Power's accounting practices pursuant to N.C.G.S. § 62-37 were
not parties affected by the Commission's order approving the set-
tlement and had no standing to appeal the Commission's order.

Appeal by respondent, petitioner Wells Eddleman, and cross-
appellant from an order entered 11 December 2002 by the North
Carolina Utilities Commission. Heard in the Court of Appeals 27
October 2003.

*Attorney General Roy A. Cooper, III, by Special Deputy
Attorney General Karen E. Long, for petitioner-appellee State
of North Carolina ex rel. Utilities Commission.*

*Executive Director Robert P. Gruber, by Chief Counsel
Antoinette R. Wike, for petitioner-appellee Public Staff—North
Carolina Utilities Commission.*

1

STATE EX REL. UTILS. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[163 N.C. App. 1 (2004)]

*No brief for petitioner-appellee F. Barron Stone.*

*Wells Eddleman, petitioner-appellant, pro se.*

*West Law Offices, P.C., by James P. West, for respondent-intervenor-appellant.*

*Kennedy Covington Lobdell & Hickman, L.L.P., by Clarence W. Walker and Kiran H. Mehta; Law Office of Robert W. Kaylor, P.A., by Robert W. Kaylor; Paul R. Newton and William Larry Porter, for petitioner-cross-appellant.*

HUNTER, Judge.

Carolina Utility Customers Association, Inc. ("CUCA") appeals an order of the North Carolina Utilities Commission ("the Commission") approving a settlement agreement regarding accounting irregularities at Duke Power, a division of Duke Energy Corporation ("Duke"). Wells Eddleman ("Eddleman") cross-appeals this order by writ of certiorari for the same reason. In turn, Duke cross-appeals the Commission's decision to allow CUCA and Eddleman to intervene in this matter. For the reasons stated herein, we affirm the Commission's order on the basis that CUCA and Eddleman are not "parties affected" by the settlement agreement as contemplated by applicable statutory authority and thus, have no standing to appeal.

In July of 2001, the Commission initiated a joint investigation with the South Carolina Public Service Commission ("SCPSC") and the North Carolina Public Staff ("the Public Staff") regarding accounting irregularities at Duke alleged by a then anonymous whistleblower. A 5 September 2001 news release announced the investigation, and the State Commissions subsequently selected Grant Thornton, L.L.P. ("GT") to audit Duke as a part of that investigation. Prior to the news release, Duke conducted its own internal investigation and provided a written report of its findings to both State Commissions on 28 August 2001.

On 5 October 2001, CUCA wrote a letter to the Commission requesting permission to participate in the investigation of Duke. As an association representing many of North Carolina's largest industrial manufacturers, CUCA wanted to insure that the interests of its rate-paying manufacturers who may have suffered disproportionately from any excessive charges for electrical power were protected. CUCA also requested that the Commission "initiate a general rate pro-

STATE ex rel. UTILS. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[163 N.C. App. 1 (2004)]

ceeding to allow interested parties to fully investigate Duke's revenues, costs, and rate design and to work with the Commission in setting rates of return that are appropriate for the current economic climate." In response to CUCA's requests, the Commission (1) stated that it was conducting the investigation pursuant to its authority under Sections 62-34 and 62-37 of the North Carolina General Statutes, which gives the Commission the discretion to proceed with or without a public hearing; (2) declined to allow CUCA to participate in the investigation; and (3) denied CUCA's request to initiate a general rate proceeding at that time.

On 8 October 2002, the Commission received GT's report regarding its audit of Duke. The report provided an "Overview of Findings" as follows:

> On Tuesday, December 8, 1998, [SCPSC] reduced the rates which South Carolina Electric and Gas (SCANA) was allowed to charge its customers after SCANA reported earnings over its allowed rate of return for the twelve month period ending September 30, 1998. [GT's] investigation has found that, in reaction to the December 1998 SCANA decision, a number of Duke mid to senior level managers met and developed a plan to identify expense and revenue items which could serve as a basis for accounting adjustments which could be made to "avoid reporting over-earnings to regulators" .... A focus of the plan was the identification and formulation of year-end 1998 entries which would minimize Duke's earned return as reported to the State Commissions, but would not impact or lower Duke Energy's consolidated earnings as reported to its investors or the Securities and Exchange Commission.

> [GT] has identified a number of entries made by Duke in the course of Duke's dealing[s] with its "allowed return problem", as it was characterized by some Duke managers. The entries identified included some of the fourteen entries pointed out by the whistleblower and addressed in the Duke Report, as well as other 1998 year-end entries, and some that affected the utility operating results for 1999 and 2000.

> [GT] has identified entries, pre-income taxes (except for the RAR Tax Entry), totaling more than $64 million that inappropriately reduced Duke's 1998 pre-tax utility operating income as reported to the State Commissions. In addition, [GT] noted entries, pre-income taxes, that inappropriately reduced Duke's reported

pre-tax earned return by $23,958,348 for fiscal 1999 and $35,198,605 for fiscal 2000.

Before the report was made public, Duke responded and contested several of the conclusions and opinions reached by GT. Duke also requested settlement negotiations in an effort to resolve the contested conclusions and opinions. Thus, the staffs of the State Commissions and Duke negotiated a proposed settlement agreement dated 22 October 2002, in which Duke agreed to the following:

1. To file for informational purposes, no later that December 1, 2002, certain regulatory reports and a reconciliation, for the years 1998, 1999, 2000 and 2001, to reflect the impact of the recommended entries set forth in the [GT] Report;

2. To restore in fiscal year 2002 the nuclear insurance reserve account to a level it would have reached had Duke not changed its accounting for nuclear insurance distributions in 1998, an adjustment of $50 million;

3. To correct in 2002 an erroneous 1998 accounting entry in the amount of $1.75 million related to its Price Anderson Act nuclear liability reserve;

4. To make a one-time $25 million credit in 2002 to its deferred fuel amounts in North Carolina and South Carolina (North Carolina in the amount of $18.75 million and South Carolina in the amount of $6.25 million) to be incorporated into the next fuel cost proceedings in the respective states;

5. To implement all of the remedial actions set forth in the Duke report of August 28, 2001;

6. To "acknowledge and regret" that communications with the two State Commissions failed to adequately detail significant changes to prior accounting practices; and

7. To charge the cost of the [GT] review to non-utility operations.

If approved by the State Commissions, the settlement agreement would "formally and positively resolve all matters within the scope of the accounting review without further controversy." A news release was issued later that same day (22 October 2002) stating that GT's report, Duke's response, and the proposed settlement agreement were available for public review and that the settlement agreement

would be considered by the Commission at a Commission Staff Conference ("the Conference") on 28 October 2002.

The Conference was an informal forum at which no testimony was pre-filed and no formal hearing or pre-hearing procedures were used. The Commission staff simply presented and explained the proposed settlement agreement and recommended its approval by the Commission. The Public Staff also recommended approval. Duke customer Eddleman and counsel for CUCA spoke in opposition to the settlement agreement, as did the whistleblower. Also, CUCA presented the Commission with a motion requesting further investigation and hearing. Nevertheless, the Commission denied CUCA's motion and voted unanimously to approve the settlement agreement. However, the vote did not immediately constitute a final order because the Commission had to await approval by the SCPSC.

In November of 2002, after the Commission's initial vote on the settlement agreement, CUCA and Eddleman filed petitions to intervene, additional motions for further investigation and hearing (arguing they were not afforded sufficient notice and hearing and that the proposed settlement agreement was inadequate), as well as exceptions and notices of appeal. In turn, Duke wrote the Commission requesting that both petitions either be ignored or denied because the Conference was not a formal evidentiary hearing allowing for intervention, and the petitions were not timely filed since the Commission had already voted to approve the settlement agreement.

The Commission subsequently issued a final order on 11 December 2002. In that order, the Commission majority granted the petitions to intervene of CUCA and Eddleman after concluding that "as ratepayers, CUCA [and] Eddleman . . . are affected by the level of Duke's rates and have an interest in this matter." The Commission majority further denied the motions for further investigation and hearing after concluding (1) the parties affected had received a proper hearing, i.e. the Conference, and adequate notice of that hearing; and (2) the results detailed in the GT report were based on a "thorough, complete and competent" investigation conducted in a manner the Commission found appropriate. Finally, the Commission majority also formally approved the settlement agreement. Two Commissioners, Lorinzo L. Joyner and James Y. Kerr, II ("Commissioners Joyner and Kerr"), agreed with the majority's decision to approve the settlement agreement, but concurred with the decision to deny the motions for further investigation and hearing because, unlike the majority, they did not believe Eddleman and CUCA were

"parties affected" as required by Section 62-37 and therefore, did not have standing to "complain about the adequacy of the notice and hearing afforded." Finally, the order opened a case sub-docket in the matter for the first time and declared the matter closed.

CUCA filed notice of appeal on 17 December 2002. Duke filed notice of cross-appeal on 6 January 2003, assigning as error the Commission's decision to allow the intervention of CUCA and Eddleman. On 13 January 2003, Eddleman also filed notice of cross-appeal, which was dismissed by the Commission as untimely. Eddleman then petitioned this Court for writ of certiorari. His petition was granted on 16 April 2003 (COAP03-293) thereby allowing his appeal to be heard in conjunction with CUCA's appeal of the Commission's order.

By this appeal, CUCA and Eddleman raise issues regarding the investigation of Duke and the Commission's subsequent order approving the settlement agreement resulting from that investigation. However, by its cross-appeal, Duke contends CUCA and Eddleman were not actually "parties affected" by the settlement agreement's approval thereby making their intervention in this matter improper. Duke further contends that, assuming their intervention was proper, the petitions to intervene filed by CUCA and Eddleman were untimely. Having concluded that CUCA and Eddleman are not "parties affected" by the order and as such have no standing to appeal the Commission's approval of the settlement agreement by that order, we do not reach the issues raised by CUCA and Eddleman.

At the outset, we note that the investigation of Duke was conducted by the Commission pursuant to its powers and duties defined under Article 3 of our General Statutes, particularly Section 62-37, and not pursuant to the Commission's judicial functions outlined in Article 4. As such, we are presented with a case of first impression because we have found no case law where the Commission has exercised its investigative authority under this statute. Nevertheless, since the Commission issued an order resulting from that investigation, that order is considered "prima facie just and reasonable." N.C. Gen. Stat. § 62-94(e) (2003). " 'Judicial reversal of an order of the Utilities Commission is a serious matter for the reviewing court,' which may be justified only by strict adherence to the statutory guidelines governing appellate review." *State ex rel. Util. Comm'n v. Carolina Indus. Group*, 130 N.C. App. 636, 638, 503 S.E.2d 697, 699 (1998) (citation omitted). The applicable statute provides as follows:

(b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

N.C. Gen. Stat. § 62-94(b).

By its cross-appeal, Duke argues CUCA and Eddleman were not "parties affected" within the meaning of Section 62-37 and therefore, should not have been allowed to intervene in this matter.

Section 62-37 provides, in pertinent part:

The Commission may, on its own motion and whenever it may be necessary in the performance of its duties, investigate and examine the condition and management of public utilities or of any particular public utility. In conducting such investigation the Commission may proceed either with or without a hearing as it may deem best, but shall make no order without affording the *parties affected* thereby notice and hearing.

N.C. Gen. Stat. § 62-37(a) (2003) (emphasis added). Here, the Commission allowed CUCA and Eddleman to intervene in this matter after concluding "as ratepayers, CUCA [and] Eddleman . . . are affected by the level of Duke's rates and have an interest in this matter" pursuant to Section 62-37. With respect to intervention under the Commission Procedural Rules: "Any person having an interest in the subject matter of any hearing or investigation pending before the

Commission may become a party thereto and have the right to call and examine witnesses, cross-examine opposing witnesses, and be heard on all matters relative to the issues involved . . . ." N.C.U.C. Rule R1-19(a). Thus, the Commission majority concluded that CUCA and Eddleman not only had an "interest in the subject matter" but were also "parties affected" by the order arising out of the investigation and Conference conducted by the Commission. However, in their concurring opinion, Commissioners Joyner and Kerr addressed this particular conclusion as follows:

> The majority essentially equates "the parties affected" with persons "having an interest," and allows CUCA [and] Eddleman . . . to intervene because they represent Duke ratepayers or are Duke ratepayers themselves. The majority applies the same, very liberal view of intervention that the Commission follows in its other proceedings. While we adhere to that view ourselves for purposes of intervention in those other types of Commission proceedings, we do not think that it is required in a G.S. 62-37(a) investigation under Article 3.

> We think that when acting pursuant to G.S. 62-37(a), the Commission has broad discretion to define the "parties affected" and to prescribe the kind of "hearing" that must precede issuance of an order. The conclusions reached by the Commission on both of these matters will necessarily depend upon the unique facts and circumstances of the case. The subject of the investigation in the instant case was whether Duke had violated Commission rules or accounting practices in the way in which it reported its regulated income to the Commission. The injury was to the authority of the Commission, not to any individual ratepayer. We think that the only party "affected" in this proceeding is Duke, the utility being investigated. Therefore, only Duke is entitled to the notice and hearing required by G.S. 62-37(a), and only Duke has standing to complain about the adequacy of the notice and hearing afforded. We do not object to the Commission's allowing others an opportunity to be heard at the Staff Conference. However, in doing so, we think that the Commission afforded those persons greater participation than is required by G.S. 62-37(a). We would deny the motions of CUCA [and] Eddleman . . . on the grounds that they were not "parties affected" and thus lacked standing.

Duke's cross-appeal essentially relies on the concurring opinion to support the following contentions: (1) CUCA and Eddleman were not

"parties" during the Conference at which the settlement agreement was initially approved; and (2) they were not "affected" by that approval in the sense contemplated by Section 62-37. We agree.

"Parties to proceedings before the Commission are designated as applicants, petitioners, complainants, defendants, respondents, protestants, or interveners, according to the nature of the proceeding and the relationship of the parties thereto." N.C.U.C. Rule R1-3(a). At the time of the Conference, CUCA and Eddleman had not been given any of these party designations; they were merely members of the public who, as Duke customers or representatives of Duke customers, were allowed to voice their disapproval over the settlement agreement. The only party at that time was Duke and, "[i]n proceedings in which there is only one party, hearings [such as the Conference] may be held at any time convenient to the Commission and to the party to the proceeding, with or without a public notice, in the discretion of the Commission." N.C.U.C. Rule R1-21(b)(1). CUCA and Eddleman were not recognized as parties, i.e. interveners, until their petitions to intervene, filed after the Conference, were granted as part of the Commission majority's final order approving the settlement agreement—filed approximately one month after the Conference. However, the Commission majority's decision to recognize CUCA and Eddleman as interveners and thus "parties affected" pursuant to Section 62-37 was an abuse of its discretion.

The phrase "parties affected" has not previously been defined for purposes of Section 62-37. Nevertheless, our Supreme Court has defined this phrase with respect to a party's right to appeal a decision of the Commission. In *In re Housing Authority*, 233 N.C. 649, 657, 65 S.E.2d 761, 767 (1951), an interpretation of former Section 62-26.6 of the North Carolina General Statutes was required, which provided "for an appeal from a determination or decision made by the Utilities Commission by any *party affected* thereby." (Emphasis added.) Our Supreme Court defined "party affected" in that statute as follows: "[A] party is not affected by a ruling of the Utilities Commission unless the decision 'affects or purports to affect some right or interest of a party to the controversy and in some way determinative of some material question involved.' " *Id.* (citation omitted). *See also Utilities Com. v. Kinston*, 221 N.C. 359, 20 S.E.2d 322 (1942) (where the North Carolina Supreme Court similarly interpreted the phrase "party affected" from former Section 1097 of the North Carolina Consolidated Statutes).

Section 62-90 has since replaced Section 62-26.6 and uses the phrase "party aggrieved" instead of "party affected." N.C. Gen. Stat. § 62-90(a) (2003). Generally, "[a] 'party aggrieved' is one whose rights have been directly and injuriously affected by the judgment entered . . . . Where a party is not aggrieved, his appeal will be dismissed." *Hoisington v. ZT-Winston-Salem Assocs.*, 133 N.C. App. 485, 496, 516 S.E.2d 176, 184 (1999) (citations omitted). This Court's interpretation of "party aggrieved" as it relates to an appeal of an order by the Commission also suggests that more than a generalized interest in the subject matter is required. *See State ex rel. Utilities Comm. v. Carolina Utility Cust. Assn.*, 104 N.C. App. 216, 408 S.E.2d 876 (1991) (holding CUCA was not an aggrieved party and dismissing its appeal of an order by the Commission for lack of standing because CUCA had failed to show that its interest in person, property, or employment has been substantially adversely affected, directly or indirectly); *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n*, 142 N.C. App. 127, 136, 542 S.E.2d 247, 253 (2001) (holding that CUCA was not a "party aggrieved" and thus, lacked standing to appeal "because the Commission's order did not impact rates and because any rate increases [would] be effectuated at subsequent rates cases").

The Supreme Court's previous definition of "party affected," as well as the Courts' definitions of "party aggrieved," are instructive and relevant to the present case. Here, an investigation of Duke's alleged accounting irregularities was conducted by the Commission pursuant to Section 62-37 of Article 3. Duke was the only party recognized by the Commission throughout the investigation, as well as the only party directly and substantially affected by any subsequent order arising therefrom in the sense envisioned by the statute. As such, only Duke was entitled to receive notice and hearing pursuant to Section 62-37 to protect its due process rights. While CUCA and Eddleman may have had an interest in the matter, their interest was only generalized and unsubstantial—not specific to them as individual Duke customers. The settlement agreement itself supports this conclusion by providing that Duke was to make a one-time credit of $18.75 million to the *State of North Carolina*, which would be incorporated into the state's next fuel cost proceeding. (We note that the fuel cost proceeding was subsequently filed by Duke on 10 March 2003. CUCA petitioned to intervene in that proceeding and was allowed to do so and subsequently made no objection to the incorporation of the $18.75 million credit in the calculation of the fuel cost adjustment approved by the Commission in its 25 June 2003 order.)

Nevertheless, CUCA and Eddleman essentially contend that they were interested and affected parties because the settlement agreement directly forecloses their property interests as ratepayers to receive adequate and reasonable relief for any excessive charges by Duke for electrical power. They further contend that their intervention was proper because there was no other party participating in the investigation and settlement agreement to adequately represent those interests. *See Bailey v. State*, 353 N.C. 142, 155, 540 S.E.2d 313, 321 (2000) (citation omitted) (providing that intervention is a matter of right " '[w]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties' ").

CUCA raised a similar argument regarding its "common law property interest ·to just and reasonable utilities rates[,]" in *State ex rel. Utilities Commission v. Carolina Utility Customers Assoc.*, 163 N.C. App. 46, 51, 592 S.E.2d 221, 225 (2004). In that case we held

> we have found no North Carolina case law recognizing the property interest alleged by CUCA in this appeal. On the contrary, our case law appears to suggest otherwise. *See State ex rel. Utilities Comm. v. Carolina Utility Cust. Assn.*, 336 N.C. 657, 446 S.E.2d 332 (1994) (holding that the defendant customers association's interest in the supplier refunds used to fund the expansion of natural gas lines was nothing more than a mere expectation of receiving those refunds and not a property right).

*Id.* at 51, 592 S.E.2d at 225. Moreover, CUCA and Eddleman fail to recognize that the Public Staff participated in the investigation of Duke and subsequently recommended approval of the settlement agreement at the Conference. The Public Staff acts independently of the Commission, and was created "to represent [the interests of] the using and consuming public" in matters before the Commission, such at the one in the instant case. *See* N.C. Gen. Stat. § 62-15(b) (2003). Thus, the Public Staff represented CUCA and Eddleman, as well as all of Duke's rate-paying customers.

In conclusion, while they may have had an interest in the matter sufficient for intervention in a hearing or investigation pending before the Commission pursuant to Article 4, Article 3 requires the prospective interveners to also be "parties affected" pursuant to

Section 62-37. CUCA and Eddleman were never made parties to the investigation by the Commission. Furthermore, since approval of the settlement agreement only had a generalized and unsubstantial affect on CUCA and Eddleman, they were not "parties affected." Had they been so affected, their intervention would have been proper and they would have been entitled to notice and hearing, as well as the opportunity to "call and examine witnesses, cross-examine opposing witnesses, and be heard on all matters relative to the issues involved . . . ." N.C.U.C. Rule R1-19(a). Accordingly, the Commission abused its discretion in granting the petitions to intervene of CUCA and Eddleman. Therefore, the Commission's order is affirmed.

Affirmed.

Chief Judge EAGLES and Judge GEER concur.

Chief Judge Eagles concurred in this case prior to 30 January 2004.